UNITED STATES OF DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ALWYN KALLIGHERI         )
     Plaintiff         )
               )
v.         )
               )         CIVIL ACTION NO.:  04-12430DPW
ANTONIO ARCOS et al,         )
     Defendants         )
               )

**MEMORANDUM IN SUPPORT OF THE
OPPOSITION OF THE PLAINTIFF, ALWYN KALLIGHERI, TO MOTION OF
DEPONENT, JUDITH LYONS, ADA, TO QUASH OR FOR PROTECTIVE ORDER
AND REQUEST FOR ORAL ARGUMENT**

## I.  Introduction

The plaintiff, Alwyn Kalligheri, submits this memorandum in support of his opposition to

the motion of proposed deponent, Assistant District Attorney Judith Lyons ("ADA Lyons"), to

quash the subpoena for her attendance at a deposition, or for a protective order concerning that

deposition.

As discussed in greater detail below, no privilege applies in the circumstances of this

case.  The anticipated examination is narrowly focused and does not threaten to entrench on the

subject matters that are protected by the privilege cited on behalf of ADA Lyons by the Attorney

General of the Commonwealth of Massachusetts.  The testimony is necessary to prevent

defendant Antonio Arcos from committing a fraud on this Court and on the finder of fact, and it

cannot reasonably be obtained elsewhere.  In addition, the conversation that is the intended

subject of the deposition has already been disclosed by the Commonwealth, and any privilege

that might otherwise attach has been waived.

## II.  The Facts

On August 26, 2003, Judith Lyons, Assistant District Attorney for Suffolk County, Massachusetts, working out of the Chelsea District Court, did the right thing.  Faced with misleading testimony concerning the circumstances leading to a warrantless home search by, among others, Antonio Arcos, then a detective with the Revere police, Lyons disclosed on the record a conversation with Arcos concerning the detective's lack of probable cause for a search warrant.  Exhibit B, submitted by ADA Lyons in hard copy and attached to notice of filing (hereinafter, "Lyons Exhibit B").

The testimony Arcos had given that required this correction came during an evidentiary hearing on Kalligheri's motion to suppress evidence allegedly found by Arcos and other Revere police officers during the warrantless home search.  Arcos had testified that when, in order to obtain consent to search, he told a tenant that he was "considering" getting a warrant to search the apartment, he believed that he had probable cause, and that he meant to convey that belief to the tenant.  Exhibit A hereto, transcript of August 26th hearing, at pp. 32-33.  Mere hours before, however, Lyons had told him that his case for probable cause did not look good.  Lyons Exhibit B.

The Court hearing the motion to suppress accepted Lyon's representations, as evidence and as the truth.  It rejected Arcos' version of events, in which Arcos portrayed a benign effort to obtain cooperation from a citizen.  Instead, the Court accepted the testimony of the tenant, key portions of which were included in the findings of fact on the motion to suppress.  Exhibit B hereto (decision on motion to suppress).  That tenant, Susan Sforza, testified that Arcos and other officers had said that Sforza should sign the consent form because they could be back in forty-five minutes with a warrant and "the dogs." If he did that, Arcos said, he would not just search

the one room he wanted to search, where Alwyn Kalligheri was staying, but would search the entire apartment. If drugs were then found, Sforza would be held responsible, also. Exhibit C, p. 13. During her encounter with Arcos, Sforza became violently ill, and twice had to go into the bathroom to vomit. Id., pp. 18-19.

The entire "consent" episode reeked of an effort to avoid a judicial determination that probable cause did not exist. Arcos testified that he and the other officers knew where Kalligheri was staying, and had the location under observation for days before calling Susan Sforza while she was at work and the apartment otherwise empty, to demand that Sforza let them enter and search. Exhibit A, pp. 45-48. Based on this and other testimony, the Court granted the motion to suppress, finding that the consent obtained from the tenant was invalid, and based on an improper misrepresentation by Arcos.

Kalligheri brought this action in state Court to recover for the violation of his civil rights committed by Arcos and the other officers involved in the knowingly illegal search. At the heart of the case for a knowingly illegal search is Arcos' knowledge that his representation to Sforza, that he had probable cause and could obtain a warrant, was false and thus an improper use of a misrepresentation to overbear Susan Sforza's will and obtain involuntary "consent" to search.

In the course of this action, Arcos has been unrepentant about the fact that he had been told that he did not have probable cause for a search. During his deposition, he flatly denied asking ADA Lyons for advice about probable cause, and even suggested that it was beneath him to seek the advice of an assistant district attorney serving in the Chelsea District Court. Exhibit D, deposition of Antonio Arcos, Day 1, at pp. 33-37. Arcos flatly denied being told by ADA Lyons that probable cause was lacking. Id. at pp. 37-39; Exhibit E, deposition of Antonio Arcos, Day 2, at pp. 17-18. As a result, it is now necessary to obtain, in detail, the information that

ADA Lyons offered in only summary fashion to the Massachusetts District Court during the suppression hearing. It is necessary to obtain testimony about precisely what Arcos asked ADA Lyons, what Lyons responded, and to give ADA Lyons the opportunity to respond to Arcos' suggestion that she misrepresented her conversation with Arcos to the Massachusetts District Court in open court. There simply is no other source for the information.

Kalligheri noticed the deposition of ADA Lyons, and has served a subpoena for ADA Lyons' attendance. Eva M. Badway, an assistant attorney general called counsel for Kalligheri and stated that ADA Lyons would not attend. Badway maintained that position notwithstanding the reminder that any privilege otherwise attaching to the conversation between Detective Arcos and ADA Lyons had long since been waived. The motion followed.

On this record, Kalligheri respectfully requests that the motion be denied in its entirety.

III. <u>Argument</u>

A. <u>Summary Of Argument</u>

Kalligheri does not seek to intrude on any executive or administrative thought-processes or determinations whether or not to prosecute. No such decisions were made by ADA Lyons. Kalligheri had already been charged and a warrant was outstanding for his arrest. Lyons merely gave advice about the absence of probable cause to search. Rather than being protected by any prosecutorial, executive or deliberative privilege, this is merely the stuff of the attorney-client privilege. The information is reasonably necessary for the prosecution of this civil-rights case, and cannot be obtained elsewhere. That privilege was waived when ADA Lyons, as the representative of the Commonwealth of Massachusetts, disclosed the substance of the pivotal conversation to avoid fraud on the Massachusetts District Court.

B.  The Executive/Prosecutorial/Governmental/Deliberative Privileges Do Not Apply

In an effort to avoid this deposition, the Attorney General dresses up a pedestrian matter in extraordinary attire.  To understand why the clothes simply don't fit, it is only necessary to consider the rules on which reliance is put and to survey the cases on which the Attorney General relies.

The immunity of a prosecutor's deliberations and decisions from judicial scrutiny is not implicated here.  Decisions concerning the prosecution of cases are, to be sure, widely recognized to fall within the discretion of the prosecuting arm of the executive branch, and judicial review over them is limited as a matter of the constitutional principle of separation of powers.  United States of America v. Berrigan, 482 F.2d 171, 180 (3rd Cir. 1973).  The core matters nearly immune from scrutiny have been itemized as follows:

> [F]ew subjects are less adapted to judicial review than the exercise by the Executive of his discretion in deciding when and whether to institute criminal proceedings, or what precise charge shall be made, or whether to dismiss a proceeding once brought.

United States of America v. Berrigan, 482 F.2d at 180, quoting from Newman v. United States, 382 F.2d 479, 480 (D.C. Cir. 1967).  The Court in Berrigan did not address the issue of a deposition in the context of a civil rights action concerning an illegal search concerning a conversation between a prosecutor and a police officer discussing whether or not probable cause existed.  It was addressing the use of a claim of discriminatory prosecution as a defense or as the basis for a motion to dismiss, and the availability of discovery concerning the deliberative process that led to the prosecution of the defendants, but not others.  United States of America v. Berrigan, 482 F.2d at 181.[1]  The Court did not flatly say that the evidence was, and would ever

---

[1] The Court referred to the subpoenas at issue as seeking "all government files relating to the decision to investigate and seek indictments in this case, and all files relating to decisions to prosecute any violations of 18 U.S.C. §1791." Berrigan, 482 F.2d at 181.

be, unavailable. It ruled, instead, that no abuse of discretion in quashing subpoenas had been shown because of the privilege otherwise applicable and because no colorable showing of selective prosecution had been made "so as to entitle [the defendants] to the desired testimonial and documentary evidence." United States of America v. Berrigan, 482 F.2d at 181-82. This case does not come within the holding of Berrigan, not only because here Kalligheri *has* made a colorable showing of wrongdoing and the need for the testimony sought, but also because Berrigan concerned matters at the very core of the privilege on which the Attorney General relies. This case does not; it does not concern whether or not to prosecute, whom to prosecute, what charges to seek or what punishment to seek. It simply concerns a discussion about whether or not probable cause existed. It hardly needs mentioning that the existence *vel non* of probable cause is most decidedly *not* a matter over which the prosecutor has separation-of-powers-based immunity from judicial scrutiny.

Newman v. United States, 382 F.2d 479 (D.C. Cir. 1967) is even further removed from the facts of this case. The sole issue in that case was whether a defendant could seek to vacate a guilty plea because he had not been offered the same plea bargain as other defendants. Holding that Courts had no power to review decisions concerning whom to prosecuted, what charges to bring and what punishments to impose, the Court quoted from a number of decisions emphasizing that the core issue was the protection of decisions concerning "whether to prosecute, when to prosecute and on what charges to prosecute." Newman v. United States, 382 F.2d at 481, n. 5, (quoting from Epperson v. United States, 371 F.2d 956 (D.C. Cir. 1967)), and at 480, n. 3 & 4, and 482. The Court distinguished matters concerning which the prosecutor acts as an officer of the Court and matters as to which the prosecutor acts as an arm of the executive branch. In the latter capacity, the prosecutor is protected from review; in the former she is not.

Newman v. United States, 382 F.2d at 481.  Newman did not concern the discoverability of a

discrete conversation concerning whether or not probable cause existed.  It concerned matters in

the core of the prosecutor's separation-of-powers-based immunity from judicial scrutiny, where

matters of probable cause do not reside.

Gomez v. City of Nashua, New Hampshire, 126 F.R.D. 432 (DC NH 1989) addresses a

broader notion of privilege, not based on separation of powers, referred to there as the

"governmental" or "deliberative process" privilege.[2]  This privilege is based on the notion that

governmental decision-making requires breathing room, and that haphazard discovery

concerning the deliberations behind that decision-making would disrupt the functions of

government employees and agents.  Gomez, 126 F.R.D. at 434.  The privilege focuses on

documents 'reflecting advisory opinions, recommendations, and deliberations comprising of a

process by which governmental decision and policies are formulated."   Gomez, 126 F.R.D. at

434, quoting from NLRB v. Sears & Roebuck & Co., 421 U.S. 132, 150-51, 95 S.Ct. 1504

(1975). The Court noted that:

> The scope of the privilege is limited by its underlying purpose and should
> not be applied where that purpose would not be served.

 Gomez, 126 F.R.D. at 435.  The Court held that certain information obtained by an assistant

attorney general as part of an investigation into possible wrongdoing by police that resulted in a

decision not to prosecute was within the core of protected materials because an essential part of

the deliberative process whether or not to prosecute, and that the requisite showings of relevance

and need had not been made.  Therefore, the information was not discoverable.  Gomez, 126

F.R.D. at 435.  Other information, however, was ruled to be subject to in-camera review to

---

[2] Although the decision recognizes that the matters at issue were within the scope of the prosecutor's privilege, i.e.,
"[t]he decision whether to prosecute," Gomez, 126 F.R.D. at 435, the decision does not rest on that privilege, but on
the broader privilege explained below.

determine whether redaction would protect the deliberative process while permitting disclosure of factual information. Gomez, 126 F.R.D. at 435-36. Gomez does not apply here because it concerned governmental deliberative processes relative to a discretionary governmental function, and the pursuit of policy. This case has no such aspects and thus falls outside of the "underlying purpose" of the privilege.

New England Medical Center, Inc. v. Rate Setting Commission, 384 Mass. 46 (1981) likewise deals with the broader "governmental" or "deliberative process" privilege, and also illustrates how this case is not within the scope of the privilege's protection. In that case, the Court addressed a demand for an adjudicatory hearing which was purportedly needed to permit the parties to question Commissioners about their decision-making processes concerning the disapproval of a reimbursement contract between an insurer and hospitals. In an earlier part of the opinion, the Court noted the broad discretionary and policy-making powers granted to the Rate-setting commission. New England Medical Center, Inc. 384 Mass. at 50-53. In holding that an adjudicatory hearing was not necessary, the Court wrote that

> [i]nquiry into the mental processes of administrative decision makers at an administrative hearing is inappropriate. … In certain cases, a court may allow examination of persons charged with the administration of an agency if the agency has not made findings at the time of its decision. … A court may also allow such examination in such circumstances where there is a strong showing of improper behavior or bad faith on the part of the administrator.  … The record reveals no such circumstances.

New England Medical Center, Inc. 384 Mass. at 55 (citations omitted). New England Medical Center, then, addressed the limited and qualified protection afforded policy-makers making discretionary decisions within the scope of their delegated legislative authority. It did not involve discovery of a discussion in which a government agent was making a legal determination

about a matter over which the Courts have the ultimate adjudicatory function, as is the case with

the existence of probable cause.

To the same effect is <u>United States v. Morgan</u>, 313 U.S. 409 (1941).  Market agencies

seeking higher rates for services to stockyards during a certain period of time challenged a

determination by the Secretary of Agriculture.  Discussing the function performed by the

Secretary in this regard, the Court wrote:

> The Secretary's task was not the usual enterprise of fixing rates for the
> future, so largely an exercise in prophesy.  Unique circumstances made
> him, in 1939, the arbiter of rates for a period between 1933 and 1937.  But
> even such a retrospective determination does not present a mathematical
> problem.  Doubts and difficulties incapable of exact resolution confront
> judgment.  More than that, since the Secretary is the guardian of the public
> interest in regulating a business of public concern, it is not for him merely
> to reflect the items on a profit and loss statement.  He must consider
> whether these represent services which properly should be charged to the
> public. … [H]e was not merely a bookkeeper posting items into a ledger.
> …
> We are in the legislative realm of fixing rates.  This is a task of striking a
> balance and reaching a judgment on factors beset with doubts and
> difficulties, uncertainty and speculation.  On ultimate analysis the real
> question is whether the Secretary or a court should make an appraisal of
> elements having delusive certainty.  Congress has put the responsibility on
> the Secretary and the Constitution does not deny the assignment.
> …
>  [W]e are moving in a difficult and specialized realm of judgment which
> has been entrusted to the Secretary of Agriculture and not to the courts.

 <u>United States v. Morgan</u>, 313 U.S. at 415, 417.  In a later passage, the Court addresses the fact

that the Secretary was called to testify concerning his deliberative process in the administrative

process by which he arrived at the rates ultimately established.  Analogizing the role of the

Secretary in such administrative proceedings to the deliberations of a judge in litigation, the

Court commented that the Secretary should never have been called to testify.  "[A]lthough the

administrative process has had a different development and pursues somewhat different ways

from those of the courts, they are to be deemed collaborative instrumentalities of justice and the

appropriate independence of each should be respected by the other." <u>United States v. Morgan</u>, 313 U.S. at 422.  Clearly, there is no similar analogy between a judicial determination of probable cause and a prosecutor's advice concerning the existence *vel non* of probable cause.

     <u>Community Federal Savings And Loan Association v. Federal Home Loan Bank Board</u>, 96 F.R.D. 619 (D DC 1983) likewise concerned the proposed deposition of high-ranking members of a government agency whose deposition was sought concerning a decision within the scope of the agency's expertise, i.e., a decision by the Federal Home Loan Bank Board to exercise its statutory authority to appoint a conservator for a bank.  The Court reviewed the various exceptions to the general rule prohibiting examination of the mental processes of high-ranking agency officials, and found that no exception applied.  <u>Community Federal Savings And Loan Association v. Federal Home loan Bank Board</u>, 96 F.R.D. at 621-22.  Once again, the case before this Court does not involve such questions of institutional competence and the respect due to the deliberations of an agency making policy decisions.

     <u>Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena</u>, 40 F.R.D. 318 (D.DC 1966) also concerned the same or similar privilege under the name "executive  privilege," relating to internal decisions of the attorney general as the government's legal representative.  The governing rule was stated as follows: "[T]he privilege obtains with respect to intra-government documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated."  <u>Id.</u> at 324.  In addition to the need for "open discussion," <u>Id.</u> at 325, the basis for the rule was put as follows: ""The judiciary, the courts declare, is not authorized 'to probe the mental processes' of an executive or administrative officer."  <u>Id.</u> at 325.  In considering whether the qualified privilege should give way to the need for discovery, the Court noted: "At stake in this litigation are not only those

governmental processes by which the Nation's legal affairs receive attention in private, but also

… those by which its high level policies are confidentially considered and determined." Id. at

328. These considerations do not apply here. No deliberative process for formulating

government action was at issue, or is being sought. Detective Arcos wanted to search. ADA

Lyons told him that he did not have probable cause. Kalligheri wants to probe the details of that

discussion with its only other participant because Arcos now denies it happened that way. Policy

had nothing to do with it, and what was at issue was probable cause, a matter clearly within the

competence of the Court, and not protected from judicial scrutiny.

In re LTV Securities Litigation, 89 F.R.D. 595 (D TX 1981) is also not on point because

it concerns a different privilege, not applicable here. That case concerned attempted discovery

from a special investigative counsel in connection with an SEC investigation. The privilege

enforced there protected information the disclosure of which might prejudice an on-going

investigation. There is no on-going investigation of probable cause here that might be

prejudiced. Because of the strength of that privilege, the analysis cited by the Attorney General,

i.e., to the effect that "mere convenience" does not outweigh the privilege, does not reflect the

proper analysis here.

Sullivan v. Stefanik, 605 F. Supp. 258 (D IL 1985) in fact supports a ruling that the

privilege does not apply and that the plaintiff is entitled to take the proposed deposition of ADA

Lyons. In Sullivan, a plaintiff brought claims of false imprisonment and malicious prosecution

against a sheriff and deputy sheriffs. The defendants argued on summary judgment motion that

because there had been a finding of probable cause in the state court, the plaintiff was

collaterally estopped on that issue, and judgment for the defendants was required as a matter of

law. The Court held that material issues of fact remained concerning the application of collateral

estoppel, and that a deposition of the prosecuting attorney could be conducted to assist in

reconstructing the proceedings that resulted in the finding of probable cause.  Discussing the

scope of the deposition, the Court wrote as follows:

> In an effort to reconstruct the state court record, plaintiff is entitled to take
> the deposition of Steven McArdle, the Assistant States Attorney who
> participated in the preliminary hearing. … Although McArdle is immune
> from civil liability under Section 1983 … he is not immune from being
> deposed in order to determine, if possible, what actually happened at the
> preliminary hearing….   McArdle can be asked to testify as to what
> happened at the preliminary hearing and can even be asked for his
> professional opinion as to what probable cause was shown at the time.

Sullivan v. Stefanik, 605 F. Supp. at 259-60.[3]  Here, analogously, A.D.A. Lyons will be asked

about what happened on a specific date, what information was provided to support the existence

of probable cause and, not her opinion *now* about the existence of probable cause, nor the mental

processes the she engaged in, but only what opinion she in fact expressed at the time.  There is

nothing here that threatens intrusion of mental processes or opinions "in the head" of A.D.A.

Lyons.

Church Of Scientology Of Boston v. Internal Revenue Service, 138 F.R.D. 9 (D MA

1990)(Bowler, MJ), is inapplicable in this case for two reasons.  First, the deposition sought of

the IRS executive related to prosecutorial decisions, Church Of Scientology Of Boston v.

Internal Revenue Service, 138 F.R.D. at 10 – 11, putting the case in the heart of the concerns that

underlie the privilege that ordinarily protects prosecutors from examination about the exercise of

their core functions.  Second, the specific privilege invoked in that case was the qualified

---

[3] In a passage more pertinent to the waiver issue, discussed in the final part of this brief, the
opinion then continues as follows: "It would be improper, however, to ask him about his own
mental processes or opinions *unless they were stated on the record at the time of the preliminary
hearing*."  Sullivan v. Stefanik, 605 F. Supp. at 260.

privilege[4] ordinarily barring the depositions of "heads of agencies and other top governmental

executives." Church Of Scientology Of Boston v. Internal Revenue Service, 138 F.R.D. at 12.

With respect, A.D.A. Lyons hardly fits that description.

 For the foregoing reasons, the privileges cited by the Attorney General on

behalf of ADA Lyons do not apply and do not bar discovery.

   B. Even If The Privilege Applies, It Is Qualified And Is Defeated Here

 Even if one or more of the privileges apply, it or they are overcome here. The cases point

out that the privileges are not absolute. They are qualified and subject to exceptions in the case

of discovery of government misconduct, United States of America v. Berrigan, 482 F.2d at 181

(showing of discriminatory prosecution); New England Medical Center, Inc. v. Rate Setting

Commission, 384 Mass.at 56 (failure of agency to make findings or evidence of improper

behavior or bad faith); Community Federal Savings And Loan Association v. Federal Home

Loan Bank Board, 96 F.R.D. at 621 (bad faith or improper behavior of regulator; failure to make

adequate administrative record); Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena, 40 F.R.D. at 329;

or special litigant need for information known on personal knowledge, Church Of Scientology

Of Boston v. Internal Revenue Service, 138 F.R.D. at 12; Community Federal Savings And Loan

Association v. Federal Home Loan Bank Board, 96 F.R.D. at 621.

 In addition, it has been pointed out that the proper approach is to balance the various

interests. The further the discovery sought is from the core of the privilege's concerns, the

lighter the burden on the party seeking it. "The applicable ["governmental" or "deliberative

process"] privileges are qualified, not absolute. … Courts in reviewing a claim of privilege are

---

[4] The Court noted that the privilege has an exception where the proposed deponent has direct personal knowledge of relevant information and the information cannot be obtained elsewhere. See also Community Federal Savings And Loan Association v. Federal Home loan Bank Board, 96 F.R.D. 619, 621 (D DC 1983). As discussed below, that exception would apply here even if, contrary to fact and law, the rule of privilege at issue in Church Of Scientology Of Boston v. Internal Revenue Service did apply.

obliged to balance competing interests ona case-by-case basis. … The interest of the party seeking disclosure is strongest when the information sought is highly relevant, helpful, and unavailable from other sources. … The interest of the party asserting a privilege is strongest when the information in question falls squarely within the definition of privilege and its disclosure would 'undermine the public interest in free, candid, and uninhibited exchange of information or jeopardize the physical security of an individual or governmental institution.'" Gomez v. City of Nashua, New Hampshire, 126 F.R.D. at 434-35.

It is immaterial whether this Court adopts a rules-based approach or a balancing test. Here, the exceptions to the rule are shown. Not only is improper government behavior alleged, it has been proved to a Court and evidence was suppressed as a result. The information is sought from a person with personal knowledge, and that person is the only source of the information. Also, the balancing test tips decidedly in favor of Kalligheri. As the discussion in section III.A. showed, if a privilege applies at all, it is only because this case is within the far penumbra of the concerns the privilege is meant to protect, and the government's interest in denying disclosure is not weighty. On the other arm of the scale is the fact that "the information sought is highly relevant, helpful, and unavailable from other sources." Id. Under either analysis, the information is discoverable and the deposition should proceed.

C. The Privilege Has Been Waived

As the Attorney General points out,[5] a protective order is available to protect only those privileges that have not been waived. Fed. R. Civ. P. 45(c)(3)(A)(iii). Even if matter would otherwise come within the cited privilege, if it has been disclosed "on the record" a waiver has

---

[5] Memorandum of Law in Support of Assistant District Attorney Lyons' Motion To Quash The Subpoena, p. 1.

occurred, and inquiry at deposition may be made into it.  <u>Sullivan v. Stefanik</u>, 605 F. Supp. at

260.[6]

There is no doubt that the communication that is the focal point of this motion has already

been disclosed and, indeed, placed "on the record."  This Court need not consider whether or not

former detective Arcos does or does not have the power to waive the privilege and whether he

has effectively done so by testifying about the conversation at his deposition.  The Attorney

General admits that ADA Lyons disclosed the substance of the conversation to the Chelsea

District Court.  This was no mere accident or unthinking slip.  It was a disclosure, by an attorney

who was appearing as a representative of the Commonwealth, made upon full consideration and

for a good and sufficient purpose – to disclose material information to that Court and to avoid the

Court's being misled by then-detective Arcos.

If there was a privilege, it has been waived.

IV.  <u>Conclusion</u>

For the foregoing reasons, the motion to quash or for a protective order should be denied.

                                        ALWYN KALLIGHERI
                                        By his attorneys,

                                        /s/ Nelson P. Lovins
                                        Nelson P. Lovins, Mass BBO# 306020
                                        Paul M. Rezendes, Mass BBO# 417850
                                        LOVINS & METCALF
                                        Chestnut Green, Suite 22
                                        Ten Cedar Street
                                        Woburn, MA 01801
                                        (781)938-8800
                                        nlovins@lovinslaw.com

Dated:  May 17, 2005

---

[6] In discussing the scope of a deposition, the Court wrote "It would be improper, however, to ask [Assistant States Attorney McArdle] about his own mental processes or opinions unless they were stated on the record at the time of the preliminary hearing."  <u>Id.</u>

EXHIBIT A

1

| | |
|---|---|
| 1 | Volume I |
| 2 | COMMONWEALTH OF MASSACHUSETTS |
| 3 | SUFFOLK, SS                CHELSEA DISTRICT COURT |
| 4 | |

5   * * * * * * * * * * * * * * * * * * * * * * * * * * * *
COMMONWEALTH OF MASSACHUSETTS

6   VS.                Docket #0314CR000704

7   MICHELLE SFORZA
    * * * * * * * * * * * * * * * * * * * * * * * * * * *

8   COMMONWEALTH OF MASSACHUSETTS
                     Docket #0314CR000659

9   VS.                Docket #0314CR000705
                     Docket #0314CR000716

10   ALWYN KALLIGHERI
    * * * * * * * * * * * * * * * * * * * * * * * * * * *

11

12

13        A HEARING before the HONORABLE TIMOTHY GAILEY
taken on August 26, 2003.

14

15   APPEARANCES:

16   ATTORNEY JUDITH LYONS
Office of District Attorney, Chelsea

17   On Behalf of the Commonwealth of Massachusetts

18

19   ATTORNEY PAUL REZENDES
Lovins & Metcalf, Ten Cedar Street, Woburn, MA 01801
On Behalf of Michelle Sforza

20

21   ATTORNEY NELSON P. LOVINS
Lovins & Metcalf, Ten Cedar Street, Woburn, MA 01801

22   On Behalf of ALWYN Kalligheri

23

24            LIPMAN COURT REPORTERS
            101 Tremont Street

25              Boston, MA 02108
             617-227-3985

1    seeking search warrants, is that fair to say?

2        A.    That's correct.

3        Q.    There is no dispute in this case that there

4    was no search warrant, is that correct?

5        A.    No, there was no search warrant.

6        Q.    Okay.    You know as a result, sir, of both

7    your training and experience that in order to obtain a

8    search warrant the Revere Police Department would need

9    to demonstrate to a magistrate something called

10   probable cause.    That's fair to say, isn't it?

11              ATTORNEY LYONS: Objection.

12              THE COURT: Overruled.

13       A.    Yes.

14       Q.    At some point you or one of the other police

15   officers said to Ms. Susan Sforza that if she didn't

16   sign this consent form that you could get a search

17   warrant in 45 minutes and be back in 45 minutes with a

18   search warrant.    Do you recall that, sir?

19       A.    No.

20       Q.    You don't recall that?

21       A.    No.

22       Q.    Did you make any representation at all, did

23   you say anything at all to Ms. Sforza about your

24   ability to get a search warrant?

25       A.    The only thing that I said to her we were

1 | contemplating to apply for a search warrant.

2 |     Q.   When you said that, sir, you believed that

3 | you did have probable cause to get a search warrant,

4 | right.

5 |           ATTORNEY LYONS: Objection.

6 |           THE COURT: Overruled.

7 |     A.   Yes.

8 |     Q.   In fact, this is what you were attempting to

9 | convey to Ms. Sforza when you said that, correct?

10 |     A.   Yes.

11 |     Q.   When you arrived at 114 Mountain Avenue you

12 | told Susan Sforza that you believed that Mr.

13 | Kalligheri, Alwyn Kalligheri was storing drugs at that

14 | site?

15 |     A.   That's correct.

16 |     Q.   As a matter of fact you say that in your

17 | police report, do you recall that?

18 |     A.   Yes.

19 |     Q.   You believed, sir, that that was the basis

20 | for probable cause, correct?

21 |     A.   Part of it.

22 |     Q.   Okay.  Let me ask you this, sir.  You're

23 | familiar in criminal cases with the so-called discovery

24 | process where counsel inquires of the Commonwealth for

25 | various information?  Are you familiar with that

1      Q.   He was leisurely filling his car?

2      A.   That's correct.

3      Q.   Is that correct?

4      A.   Yes.

5      Q.   Up to that time you wouldn't say he fled from

6 Mountain Avenue, correct?

7      A.   No.

8      Q.   In fact, your police report does say that he

9 exited Mountain Avenue?

10     A.   That's correct.

11     Q.   The flight took place from the gas station?

12     A.   Yes.

13     Q.   By the way, during the two or three days that

14 you knew according to your testimony that Mr.

15 Kalligheri was living in that apartment and while you

16 had this place under surveillance did you -- you

17 didn't seek to obtain a search warrant at any time

18 during that period, did you?

19     A.   No.

20     Q.   It's fair to say during all of that time you

21 had an arrest warrant for Mr. Kalligheri, right?

22     A.   Yes.

23     Q.   In fact, you were the one who actually made

24 the observation of alleged distribution?

25     A.   That's correct.

1      Q.    During that two or three days you believed

2   that he had been storing drugs at 114 Mountain Ave,

3   right?

4      A.    Yes.

5      Q.    Nevertheless you didn't seek to obtain a

6   search warrant, correct?

7      A.    No.

8      Q.    Detective Arcos, during the two or three day

9   period that a surveillance was going on at 114 Mountain

10  Avenue in addition to you being involved there were

11  some other officers, correct?

12     A.    Yes.

13     Q.    There was a Sergeant Borgioli?

14     A.    Borgioli.

15     Q.    And an Officer Diliegro?

16     A.    Diliegro.

17     Q.    And Officer Salvatti?

18     A.    No, Officer Salvatti wasn't involved during

19  the surveillance.

20     Q.    Who was the other officer?

21     A.    Just the only three people in the drug unit,

22  three officers.

23     Q.    Now, during that two or three day period,

24  sir, is it fair to say that you, as far as you know

25  none of the others observed any illegal drug

1    transaction going on at that location?

2        A.    We didn't dedicate 24 hour surveillance at

3    that location.  From time to time, ten minutes here,

4    ten minutes there.  During, no.

5        Q.    At any time that you and the other officers

6    had the location under surveillance you did not make

7    any observation about any illegal drug transaction

8    going on, is that right?

9        A.    That's correct.

10       Q.    You did not make any observation about any

11   drugs being transported from 114 Mountain Avenue to any

12   location, correct?

13       A.    That's correct.

14       Q.    Is that right?

15       A.    Yes.

16       Q.    You did not make any observation about any

17   drugs being transported to 114 Mountain Ave, is that

18   correct?

19       A.    Yes.

20       Q.    That is correct?

21       A.    Yes.

22       Q.    In the two or three days that you had the

23   premises under surveillance, sir, how many times if you

24   can recall did you observe Mr. Kalligheri either

25   entering or leaving?

1    A.    None.

2    Q.    But you nevertheless continued to believe

3  that he lived there?

4    A.    Yes.

5    Q.    Now, after the flight, Detective, the flight

6  of Mr. Kalligheri from the gas station you and the

7  other officers went back to 114 Mountain Avenue, didn't

8  you?

9    A.    That's correct.

10    Q.    It's fair to say that when you returned to

11  the premises you knew that there was no one home,

12  correct?

13    A.    Yes.  We knocked on the door and we got no

14  answer.  We knocked on the door and we got no answer.

15    Q.    You came back to the house somewhere around,

16  somewhere between 11:30 and one o'clock?

17    A.    Somewhere in there.

18    Q.    Is that fair to say?

19    A.    Yes.

20    Q.    So when you returned you knew no one was

21  there.  You believed you had probable cause to get a

22  search warrant, is that correct?

23    A.    Yes.

24    Q.    Mr. Kalligheri had already fled, correct?

25    A.    That's correct.

**EXHIBIT B**

COMMONWEALTH OF MASSACHUSETTS

Trial Court                                    Chelsea District Court
District Court Department

COMMONWEALTH OF MASSACHUSETTS   )
                                )           0314    0705
            VS.                 )           0014  CR  1224
                                )           applies to 3 cases
ALWYN KALLIGHERI,   Defendant   )                    03-70?
                                                 03   659
        FINDINGS AND DECISION ON MOTIONS TO SUPPRESS   03  716      T.G

        Defendant Alwyn Kalligheri ("Kalligheri") was charged with
drug and related offenses as a result of observations made after a
warrantless entry by police into an apartment ("the Apartment")
located at 114 Mountain Avenue, Apartment 1, Revere, on March 25,
2003.  Defendant moved to suppress all evidence obtained as a
result of the entry, and in particular the alleged contraband found
in the Apartment.  For the following reasons his motion is ALLOWED.

        Based on the evidence submitted at the motion hearing, on my
assessment of the credibility of the witnesses who testified, and
reasonable inferences drawn from the facts proved, I find that:

        On March 25, 2003, Revere Police Detective Antonio Arces, who
is an experienced officer in the Drug Control Unit, was on duty in
plain clothes in the area of 114 Mountain Ave. in Revere.  He was
with two other officers in plain clothes, and a third officer in
uniform.  The police had been observing that location off and on
for 2 or 3 days, seeking to investigate Kalligheri's whereabouts.
At that time they had an outstanding arrest warrant for Kalligheri
on prior drug charges.

        At some point the police saw Kalligheri emerge from the
building, get into a car and drive off.  The police followed.
Kalligheri proceeded to a gas station, where he stopped for fuel.
The officers then approached him to make an arrest pursuant to the
warrant.  Kalligheri immediately got into his car and drove off at
a high rate of speed.  The police gave chase, but when Kalligheri
exceeded 100 mph the police broke off the chase in the interest of
safety.

        The police thereupon returned to 114 Mountain Ave.  114
Mountain Ave. is a multifamily dwelling, but the police believed
that Kalligheri was living in Apartment 1 of the dwelling.  The
name "Kalligheri" appeared on one of the mailboxes for the
building.

        The police knocked on the door of Apartment 1, but no one
answered.  They then telephoned the person they believed was the
tenant of Apartment 1, Susan Sforza, who was then at work.  They

asked her to come to the apartment, and in 20 minutes or so she came, with a friend from work.    Susan Sforza, who is a codefendant's mother, invited the officers into the Residence to talk.    She told the officers that her daughter and Kalligheri were residing in a bedroom in the residence.    She showed them the bedroom, which was not locked and the door of which was open wide. The officers at that time did not search the bedroom, but rather sat around the kitchen table with Susan Sforza to talk, for about 10 - 15 minutes.

The officers asked Susan Sforza for consent to search the bedroom, and ultimately she did give such consent and signed a written consent form.    It is the validity of that consent that the Defendant challenges.

After obtaining Susan Sforza's consent, the officers searched the bedroom, and found on the top of the bureau in the room some pills and 4 clear plastic bags, two of which contained a white substance, which were taken into custody.

With respect to the validity of the consent, I find first that the initial entry by the police culminating in the conversation around the kitchen table was at Susan Sforza's invitation, it was consensual and uncoerced and not in any way the result of police misconduct.

However, in the course of that conversation the police intentionally and deliberately told Susan Sforza that they could obtain a warrant in 45 minutes and that if they did so they would search the entire Apartment and leave the Apartment, including Susan Sforza's bedroom, in a mess.    They told her, however, that if she consented to the search it would be limited to the daughter's and Defendant's joint bedroom.    The police in fact had considered whether they could obtain a search warrant and had secured some legal advice in that regard, and they knew that it was unlikely that they had probable cause for the issuance of a search warrant for the Residence.    In fact, based on the evidence submitted at the hearing it is clear that they did not have probable cause, and they knew it.

Accordingly, to deliberately mislead Susan Sforza as to their ability to get a warrant, solely to get her to consent to the search, was in effect a fraud on her.    Her consent to the search was not validly obtained.

Her consent to the search having been obtained through a deliberate misrepresentation, that consent is a nullity.    The search of the bedroom having been made without a warrant and without valid consent, its results should be suppressed.

Accordingly, Defendant's motion to suppress is ALLOWED, and all evidence obtained as a result of the search of Defendant's bedroom in the Sforza Apartment should be suppressed.

Timothy H. Gailey,
Presiding Justice

DATED: September 9, 2003

**EXHIBIT C**

1

1          Volume II

2          COMMONWEALTH OF MASSACHUSETTS

3    SUFFOLK, SS                    CHELSEA DISTRICT COURT

4    * * * * * * * * * * * * * * * * * * * * * * * * * * *
     COMMONWEALTH OF MASSACHUSETTS

5    VS.                            Docket #0314CR000704

6    MICHELLE SFORZA

7    * * * * * * * * * * * * * * * * * * * * * * * * * * *
     COMMONWEALTH OF MASSACHUSETTS

8                                   Docket #0314CR000659
     VS.                           Docket #0314CR000705

9                                   Docket #0314CR000716
     ALWYN KALLIGHERI

10   * * * * * * * * * * * * * * * * * * * * * * * * * * *

11
            A HEARING before the HONORABLE TIMOTHY GAILEY

12   taken on August 27, 2003

13
     APPEARANCES:

14
     ATTORNEY JUDITH LYONS

15   Office of District Attorney, Chelsea, MA
     On Behalf of the Commonwealth of Massachusetts

16
     ATTORNEY PAUL REZENDES

17   Lovins & Metcalf, Ten Cedar Street, Woburn, MA 01801
     On Behalf of Michelle Sforza

18
     ATTORNEY NELSON P. LOVINS

19   Lovins & Metcalf, Ten Cedar Street, Woburn, MA 01801
     On Behalf of Alwyn Kalligheri

20

21

22
                  LIPMAN COURT REPORTERS

23                101 Tremont Street
                  Boston, MA 02108

24                617-227-3985

25

1      A.    Six.

2      Q.    Is it correct that would be you and Ms.

3  Barber and the four officers?

4      A.    Correct.

5      Q.    What's the next thing that you remember

6  anyone saying?

7      A.    The next thing I remember someone saying is

8  we have two ways we can handle this.  You can sign this

9  form and this would make sure no one in your family

10  would be in trouble because we know it's Al if we find

11  anything, and no one will be in trouble.  Or we can

12  come back, and I heard someone -- another officer on

13  the side saying we can come back in 45 minutes.  He

14  said we can come back in 45 minutes with a warrant with

15  a dog.  And if we find anything we're going to rip this

16  house apart and you're responsible.

17          At that point I really became really scared.

18  I excused myself and asked if I could go to the

19  bathroom.  One of the officers accompanied me down the

20  hall where I went into the bathroom and I was sick.  I

21  came back out.  I went back out into kitchen again.

22      Q.    At any point did any of the officers say

23  anything to you about Al Kalligheri, Junior's job

24  status.

25      A.    Yes.  They asked me what was the connection

```
1        Q.    Do you see that next to various so-called
2   bullet points there is a double S written, initials SS?
3        A.    Yes.
4        Q.    Your name is Susan Sforza, is that correct?
5        A.    Yes.
6        Q.    You initialed those?
7        A.    Yes, I did.
8        Q.    Why did you initial those?
9        A.    They told me to.
10       Q.    Did you read them?
11       A.    No.
12       Q.    Did you excuse yourself to go to the bathroom
13   during this?
14       A.    Yes.
15       Q.    Sorry.  Let me just finish.  Sorry for
16   hesitating.  During the time that this confrontation or
17   meeting was going on with the police did you excuse
18   yourself to go to the bathroom once or more than once?
19       A.    More than once.  I went twice.
20       Q.    Twice?
21       A.    Yes.
22       Q.    Without having to get into too much detail
23   what occurred when you were in the bathroom?
24       A.    I was sick.  I vomitted.
25       Q.    Were you feeling at this time threatened at
```

1  all?

2       A.    Totally.

3       Q.    Why's that?

4       A.    I thought they were coming back with dogs and

5  ripping that house apart.

6       Q.    Did you think you had any choice between

7  signing and not signing?

8       A.    No.

9       Q.    Did you ever tell the officers that you were

10  uncertain or didn't know what you should do?

11      A.    Yes.

12      Q.    What was their response?

13      A.    Just sign it.

14      Q.    Anybody ever tell you that you had a right to

15  demand that they go out and actually get the warrant?

16      A.    No.

17      Q.    After the form was signed the officers went

18  into the room, didn't they, the bedroom?

19      A.    Yes.

20      Q.    Do you recall whether they closed the door?

21      A.    I saw them close the door as --  I chose not

22  to stay in the kitchen at that point.   Donna suggested

23  we go sit outside.  We walked down the hall the same

24  time as they did.  They went into the bedroom and

25  closed the door.

**EXHIBIT D**

Volume I
Pages 1-46

COMMONWEALTH OF MASSACHUSETTS

ESSEX, SS.                          SUPERIOR COURT
                                    DOCKET NO. 2004-486C

————————————————————— )
                                   )
ALWYN KALLIGHERI,                  )
            Plaintiff,             )
                                   )
v.                                 )
                                   )
ANTONIO ARCOS, MARTIN DILIEGRO     )
and CARL BORGIOLI,                 )
            Defendants.            )
————————————————————— )

DEPOSITION OF ANTONIO ARCOS, a

witness called on behalf of the Plaintiff, taken

pursuant to the Massachusetts Rules of Civil

Procedure, before Diane Hulme, Court Reporter and

Notary Public in and for the Commonwealth of

Massachusetts, at the Law Offices of Lovins and

Metcalf, Ten Cedar Street, Chestnut Green,

Woburn, Massachusetts, on Tuesday, May 18, 2004,

commencing at 10:28 a.m.

MELVIN LIPMAN
COURT REPORTER
101 Tremont Street - Suite 700
Boston, Massachusetts  02108
Tel. (617) 227-3985

33

Q.   Officer Arcos, do you recall in the approximate time frame of March 24th, March 25th, perhaps March 23rd, 2003 that you had a conversation with an attorney Judith Lyons an assistant district attorney at the Chelsea district court about whether she believed you'd be able to get a search warrant for 114 Mountain Ave?

A.   I didn't have any conversation with her on the 23rd or the 24th.

Q.   Did you have a conversation with her at any time about whether she thought you could get a search warrant at 114 Mountain Avenue?

A.   I had a conversation with her on the 25th.

Q.   On the 25th?

A.   Yes, sir.

Q.   And you asked her, did you not, whether you would be able to get a search warrant?

A.   Not specifically.

Q.   All right.  Do you recall testifying at the Motion to Suppress hearing concerning case 705 which is the one that involved 114 Mountain Avenue?

A.   Yes, sir.

Q.   Do you recall during a recess that you had a

34

1       conversation with Attorney Judith Lyons?

2   A.  Yes, sir.

3   Q.  During that recess, sir, didn't she ask you

4       whether this was the case meaning the case that

5       was on before Judge Gailey at the time whether

6       this was the case about which you had called her

7       asking whether you had enough to get a search

8       warrant?

9   A.  Could you repeat the question again?

10  Q.  Sure.  Do you recall talking with a DA Judith

11      Lyons during a recess about whether this was the

12      case, that is, No. 705 whether that was the case

13      about which you had called her and asked her

14      whether you had enough to get a search warrant?

15  A.  Yes, that was the case.  But I didn't ask her if

16      I had enough, you know, to get a search warrant.

17      I was just getting some legal opinions on the

18      ongoing case.

19  Q.  Let me read for the record what Ms. Lyons did say

20      there in open court.  And then I'll mark these

21      pages as an exhibit.  She says, this is during

22      the recess, We had a certain disclosure we need

23      to make to the Court.  I suggest we do it not

24      with the presence of the witness.  The judge then

35

1    says, I guess you should step out.

2        Do you recall that?  Do you recall then

3    stepping out?

4  A.   No.

5  Q.   She then says, that is, Attorney Lyons, Your

6       Honor, with regard to this case my memory was

7       jogged during the course of the testimony with

8       regard to this case that around the date in

9       question Detective Arcos had placed a call to me

10      here at the office giving me some information

11      generally about a case wondering whether or not

12      he had enough to get a search warrant.  He did

13      not disclose to me the name of the case or

14      anything like that.  I had indicated to him on

15      the phone it didn't look good.  I had indicated

16      to him on the phone -- I'm sorry, I'm repeating

17      that.  I had indicated to him on the phone it

18      didn't look good but I didn't know if he had any

19      other information.  That was the end of the phone

20      call.  I did not realize any of this until during

21      the course of the testimony and things began to

22      suddenly make sense.  I briefly asked Detective

23      Arcos on my way outside, Was this the case you

24      called me about?  He said, Yes.

36

1         Do you now remember talking to her about

2    whether there was enough to get a search warrant

3    at 114 Mountain Avenue?

4  A.  Like I said I was just gathering some legal

5    opinions.  I didn't ask her.  I don't base my

6    final opinion on seeking a search warrant on a DA

7    from Chelsea district court.

8  Q.  So you say that you did not ask her whether there

9    was enough to get a search warrant?

10  A.  Yes, sir.

11  Q.  Based on what she says in open court, I'll point

12    you here, she says, Detective Arcos had placed a

13    phone call to me.

14  A.  No.  I called Chelsea district court.  It just

15    happened to be Judith Lyons was the one that

16    answered the phone.

17  Q.  So you say that she was --

18  A.  I wasn't looking for her specifically.

19  Q.  So you say that her open court representation

20    that I've just read from this transcript is

21    simply flat out wrong?

22           MR. SIMPSON:  Objection to the

23    form.  You can answer.  You can answer.

24  A.  Yes.  It wasn't like that the conversation that I

37

1     had with her.

2  Q.  Well, let me ask you this:  If you say you didn't

3      talk with her --

4  A.  I didn't say that I didn't talk to her.

5  Q.  Well, did you or didn't you?

6              MR. SIMPSON:  I believe he

7      testified he did at the judgement.

8  Q.  You did testify?

9  A.  Yes.

10 Q.  But you didn't ask her whether or not you had

11     enough to get a search warrant is that what

12     you're saying?

13 A.  That's correct.

14 Q.  What did you talk to her about, do you recall?

15 A.  In general I don't recall exactly what words

16     exactly I used.  But in general I gave some facts

17     to what the case was and that was it.

18 Q.  Do you remember who you spoke to?

19 A.  I spoke to Judith Lyons.

20 Q.  You did?

21 A.  I testified to that, sir.

22 Q.  What did she say, do you recall?

23 A.  She wasn't sure.

24 Q.  Because she says here, quote, I had indicated to

38

1    him on the phone it didn't look good.

2  A.  She wasn't sure.

3  Q.  So you say that means to you it didn't look good.

4              MR. LOVINS:  Would you mark this as

5    an exhibit?

6              (Exhibit No. 4, transcript

7    testimony, marked for identification.)

8  Q.  Mr. Arcos, have you actually read the decision of

9    Judge Gailey?

10  A.  Yes, sir.

11  Q.  You have.  There's a paragraph --  When did you

12    read this by the way?

13  A.  I don't recall.

14  Q.  There's a paragraph in this decision which reads

15    as follows:  However, in the course of that

16    conversation, the police intentionally and

17    deliberately told Susan Sforza that they could

18    obtain a warrant in forty-five minutes and if

19    they did so they could search the entire

20    apartment and leave the apartment including

21    Susan's Sforza's bedroom in a mess.  They told

22    her, however, that if she consented to the search

23    it would be limited to the daughter's and the

24    defendant's joint bedroom.

1    The police, in fact, had considered whether

2    they could obtain a search warrant and had

3    secured some legal advice in that regard and they

4    knew that it was unlikely that they had probable

5    cause for the issuance of a search warrant for

6    the residents.

7    In fact, based on the evidence submitted at

8    the hearing it's clear that they did not have

9    probable cause and they knew it.

10    Do you understand that these are findings of

11    fact which were made by the judge from the

12    evidence?

13    A.    In my answer to that, I said completely no to

14    that I was never afford the opportunity to

15    explain myself in an open court.

16    Q.    But my question is:  Do you understand -- strike

17    that.

18    You've been involved in a number of motions

19    to suppress I take it over the years?

20    A.    Yes.

21    Q.    And you've seen a number of decisions as a result

22    of those hearings?

23    A.    Yes, sir.

24    Q.    You understand what I just read is part of the

EXHIBIT E

1     COMMONWEALTH OF MASSACHUSETTS

2  ESSEX, SS.    SUPERIOR COURT

3         CIVIL ACTION

4        NO.  2004-486C

5

6  *****************************

7  ALWYN KALLIGHERI,     *

8   PLAINTIFF      *

9  VS.          *

10  ANTONIO ARCOS, MARTIN   *

11  DILIEGRO,& CARL BORGIOLI,  *

12   DEFENDANT      *

13  *****************************

14

15     **CONTINUED DEPOSITION of ANTONIO**
ARCOS, a witness called on behalf of the

16 Plaintiff, pursuant to the applicable
provisions of Massachusetts Rules of

17 Civil Procedure, before Marjorie L.
Simmons, a Shorthand Reporter and Notary

18 Public in and for the Commonwealth of
Massachusetts on Wednesday, December 15,

19 2004, commencing at 11:00 a.m., at the
offices of Lovins & Metcalf, 10 Cedar

20 Street, Woburn, Massachusetts.

21

22

23    **MELVIN LIPMAN & ASSOCIATES**
      Court Reporters

24     101 Tremont Street
   Boston, Massachusetts  02108
     {617} 227-3985

1    A.    Yes.

2    Q.    "The defendants, before making this

3          misrepresentation, had been advised by

4          Assistant District Attorney for Suffolk

5          County they lacked probable cause to

6          obtain a search warrant."

7                Have I read it correctly?

8    A.    You read that correctly, but that is not

9          what she advised me.

10   Q.    The Assistant District Attorney was

11         Judith Lyons, is that right?

12   A.    Yes.

13   Q.    At the time she was assigned to the

14         Chelsea District Court, is that correct?

15   A.    Yes.

16   Q.    And on March 25th you did have a

17         conversation with her by telephone,

18         correct?

19   A.    Yes.

20   Q.    That was in connection with a possible

21         search of 114 Mountain Avenue, is that

22         correct?

23   A.    Yes.

24   Q.    Tell me what your best memory of that

1       conversation is?

2   A.  I don't recall the conversation, you

3       know, the details or the information

4       given to her at that time.  However, I

5       recall she saying she wasn't sure what

6       information I was providing her, if I

7       could apply for a search warrant.

8   Q.  Are you aware that she advised the court

9       at the suppression hearing that she told

10      you, that she used the words "it didn't

11      look good" when you asked her if you

12      could get a search warrant?  Are you

13      aware she used those words?

14  A.  You showed me the transcript.

15  Q.  Okay.  So you are aware?

16  A.  At the first deposition, yes.

17  Q.  Is it your testimony that you disagree

18      with that?

19  A.  Yes.

20  Q.  Now, in that conversation, Officer Arcos,

21      when she said to you according to your

22      testimony here she wasn't sure, what was

23      your response to that?

24  A.  I don't recall.